## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**RHINA ALVARENGA**,

               Plaintiff,

   v.

**COVERALL OF NORTH AMERICA, d/b/a Coverall Cleaning Concepts and Coverall of Boston, and SUNRISE SENIOR LIVING, INC., d/b/a Sunrise of Arlington**,

               Defendants.

Case No. 05-11819 JLT

## MEMORANDUM OF LAW IN SUPPORT OF COVERALL NORTH AMERICA, INC.'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION AND TO EXTEND TIME TO RESPOND TO THE COMPLAINT

Defendant Coverall North America, Inc., d/b/a Coverall Cleaning Concepts and Coverall of Boston ("Coverall"), by its attorneys, respectfully submits this Memorandum of Law in Support of its Motion (i) pursuant to Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, to Stay Proceedings Pending Arbitration; and (ii) pursuant to Rule 6(b), Fed.R.Civ.P., to extend Coverall's time to answer, move or otherwise plead in response to plaintiff's Amended Complaint until the Court resolves Coverall's Motion to Stay Proceedings.

### PRELIMINARY STATEMENT

This action arises out of a written Franchise Agreement entered into by and between Coverall, a franchisor of commercial janitorial cleaning businesses, and plaintiff Rhina Alvarenga. Pursuant to the Franchise Agreement, Coverall offered, and plaintiff accepted, a limited license to operate a Coverall franchise in Massachusetts. Now claiming that Coverall made certain misrepresentations in connection with plaintiff's execution of the Franchise Agreement and, further, that she was not properly compensated for some of the services she

claims to have performed pursuant to that agreement, plaintiff commenced an action in the Superior Court of the Commonwealth of Massachusetts, Middlesex County. That action, entitled *Rhina Alvarenga v. Coverall of North America d/b/a Coverall Cleaning Concepts and Coverall of Boston, Sunrise Senior Living, Inc. d/b/a Sunrise of Arlington,* Civil Action No. MICV2005-01782-A, was removed to this Court on or about September 9, 2005.

The merits (or lack thereof) of plaintiff's claims aside, plaintiff and Coverall agreed, in entering into the Franchise Agreement, that they would submit all disputes arising out of or relating to the Franchise Agreement, the validity of that agreement or the parties' relationship, to arbitration before the American Arbitration Association. Since, as shown below, plaintiff's claims fall well within the ambit of the parties' arbitration agreement, § 3 of the FAA requires that this action be stayed pending arbitration.

**RELEVANT BACKGROUND FACTS**

**A.    The Parties**

Coverall is a Delaware corporation with its principal place of business in Boca Raton, Florida. Coverall is engaged in the business of granting franchises to qualified persons to operate commercial janitorial cleaning businesses, and to use Coverall's trade names and marks, as well as Coverall's operating system (the "Coverall® System"), in connection therewith. Coverall franchisees are provided with, among other things, training, equipment, billing and collection services, and a quality control program. Coverall also provides its franchisees customer accounts to clean. Under the Coverall System, Coverall enters into contracts with customers for cleaning services, and delegates the performance of the services under the contracts to its franchisees.

Plaintiff is a former Coverall franchisee.  On June 5, 2003, plaintiff entered into a written Janitorial Franchise Agreement with Coverall pursuant to which Coverall offered, and plaintiff accepted, a limited license to operate a Coverall franchise.[1]  (A true and correct copy of the Franchise Agreement is annexed hereto as Exhibit A.)  One of the customers that plaintiff serviced as a Coverall franchisee was Defendant Sunrise Senior Living, Inc. d/b/a Sunrise of Arlington ("Sunrise").  In or around October of 2003, Plaintiff was discharged by Sunrise's Regional Director because she repeatedly failed to provide satisfactory services.[2]  Plaintiff subsequently abandoned her Coverall franchise.

**B.      The Parties' Arbitration Agreement**

In entering into the Franchise Agreement, Coverall and plaintiff explicitly agreed that they would submit all disputes arising out of or relating to the Franchise Agreement, the validity of that agreement or the parties' relationship to arbitration before the American Arbitration Association.  Paragraph 21 of the Franchise Agreement thus provides, in pertinent part:

> [A]ll controversies, disputes, or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or

---

[1]      Plaintiff alleges that she first saw the Franchise Agreement on May 29, 2003, the date on which she signed the agreement.  (Amended Complaint ¶11.)  That is simply untrue.  In accordance with the requirements of the Federal Trade Commission's Franchise Rule, 16 C.F.R. §436, plaintiff was given a copy of Coverall's Uniform Franchise Offering Circular on May 7, 2003 – twenty days before she signed the Franchise Agreement.  The Franchise Agreement that plaintiff signed was one of the exhibits to the Offering Circular.

[2]      Coverall recently learned that plaintiff (apparently unhappy with the compensation she was receiving from Sunrise) improperly and deceptively attempted to convince many of Sunrise's elderly residents to pay her directly for the services she was already contractually required to perform.

operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual . . . shall be submitted promptly for arbitration.

Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.

(*See* Exhibit A, § 21, pp. 20-21.)

## C.   **Plaintiff's Complaint**

Notwithstanding the parties' agreement to arbitrate their disputes, on or about May 24, 2005, plaintiff filed a Complaint against Coverall and Sunrise in the Superior Court of the Commonwealth of Massachusetts.  An amended complaint was filed on August 8, 2005.  That action, entitled *Rhina Alvarenga v. Coverall of North America d/b/a Coverall Cleaning Concepts and Coverall of Boston, Sunrise Senior Living, Inc. d/b/a Sunrise of Arlington,* Civil Action No. MICV2005-01782-A, was removed to this Court on or about September 9, 2005.

Plaintiff's Amended Complaint alleges, in substance, that Coverall fraudulently induced her to enter into the Franchise Agreement by misrepresenting (1) the nature and profitability of the accounts she would receive, (2) the services Coverall would provide under the Franchise Agreement, and (3) the manner in which services she was to provide would be negotiated and billed.   (Amended Complaint ¶14.)   Plaintiff also contends that she was not properly compensated for the services she claims to have performed (*id*. at ¶¶17-35) and, further, that Coverall refused her demand for "restitution" and "wages" to which she claims she is entitled. (*Id*. at ¶36.)  Based on these allegations, plaintiff's Amended Complaint purports to assert claims for fraud (Count I), violation of Massachusetts General Laws c.93A (Counts II and III),

rescission (Count IV), breach of contract (Count V), breach of fiduciary duty (Count VI), breach of the implied covenant of good faith (Count VII), violation of various inapplicable wage acts (Counts XIII-X) and for "services rendered" (Count VI).

## ARGUMENT

### This Action Should Be Stayed Pending Arbitration

### I.    The FAA Mandates That All Arbitrable Claims Be Submitted To Arbitration

The principles underlying the policies favoring arbitration agreements are well-established in this Circuit.  Where, as here, "there is an agreement to arbitrate, the FAA reflects a strong, well-established, and widely recognized federal policy in favor of arbitration." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 29 F.3d 727, 730 (1st Cir.), *aff'd*, 515 U.S. 528 (1995); *accord KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp*., 184 F.3d 42, 49 (1st Cir. 1999); *Painewebber Inc. v. Elahi*, 87 F.3d 589, 593 (1st Cir. 1996) ("[T]he FAA "'is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.'") (quoting *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983)). Indeed, "[t]he 'primary purpose' of the FAA is to ensure 'that private agreements to arbitrate are enforced according to their terms.'" *Elahi*, 87 F.3d at 593 (quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 479, 109 S. Ct. 1248, 1256 (1989)); *accord Moses H. Cone Memorial Hosp.*, 460 U.S. at 24 (the FAA expresses Congress' intent "to mandate enforcement of all covered arbitration agreements").[3]

---

[3]    The arbitration agreement at issue in this case clearly falls within the scope of the FAA. The FAA applies whenever there is an agreement to arbitrate contained in "a contract evidencing a transaction involving commerce."  9 U.S.C. § 2; *see also Allied-Bruce Terminix Cos. v.*

*(footnote continued to next page)*

One of the primary vehicles for the enforcement of arbitration agreements is § 3 of the

FAA.  That section provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such agreement, shall on application of one of the parties, stay the trial of the action until such arbitration has been had in accordance with the terms of the Agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  In other words, absent proof that the party seeking to invoke arbitration is "in

default in proceeding with . . . arbitration" – which is not at issue here – a party is entitled to a

stay under § 3 if the court is satisfied that the issue in the pending action "is referable to

arbitration under [the parties' agreement]."  *See also KKW Enterprises, Inc.*, 184 F.3d at 50

(under § 3 of the FAA, if a suit is brought "on an issue referable to arbitration under a written

---

*(footnote continued from previous page)*

*Dobson*, 513 U.S. 265, 273-74, 115 S. Ct. 834, 841 (1995).  The term "commerce" is to be broadly construed.  *Prima Paint Corp. v. Flood & Conklin Mfg. Corp.*, 388 U.S. 395, 401-02, 87 S. Ct. 1801 (1967).  In fact, the Supreme Court has held the FAA extends to the full reach of the Commerce Clause.  *See Allied-Bruce Terminix*, 513 U.S. at 273-74, 115 S. Ct. at 841.  As noted above, the Franchise Agreement was entered into between plaintiff, a Massachusetts resident, and Coverall, a Delaware corporation with its principal place of business in Florida.  Since the Franchise Agreement calls for a continuous stream of products and funds to be exchanged between these diverse parties, the agreement plainly evidences "commerce" among the several states for purposes of the FAA.  *See KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 49 (1st Cir. 1999) (franchise agreements between Massachusetts franchisee and Illinois franchisor "implicate interstate commerce, thus subjecting them to the reach of the FAA"); *Ommani v. Doctors Assoc., Inc.*, 789 F.2d 298, 299 (5th Cir. 1986) (fraud claims between Connecticut franchisor and Texas franchisee evidence commerce within the meaning of the FAA); *Creson v. Quickprint of America, Inc.*, 558 F. Supp. 984, 986 (D. Mo. 1983).  Furthermore, Coverall and plaintiff agreed, in Section 21 of the Franchise Agreement, that "[a]rbitration shall be subject to the Federal Arbitration Act."

arbitration agreement, the court shall stay a matter until the arbitration "has been had in accordance with the Agreement").[4]

## II.    The Arbitration Clause In The Franchise
         Agreement Encompasses Each Of Plaintiff's Claims

The issues raised in plaintiff's Amended Complaint are clearly subject to arbitration under the parties' written Franchise Agreement.   "[W]hether an issue is to be decided by [an] arbitrator is a matter of the parties' contractual intent." *Elahi*, 87 F.3d at 593.   However, "[t]he court is to make this determination by applying the 'federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'"  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353 (1985) (quoting *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24, 103 S. Ct. at 941); see also *Lee v. Chica*, 983 F.2d 883, 886 (8th Cir.) ("[a]rbitrability of contracts evidencing interstate commerce is governed by federal substantive law rather than state law"), *cert. denied*, 510 U.S. 906 (1993). That body of law "'establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'"  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S. Ct. 1212, 1218 n.8 (1995) (quoting *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25, 103 S. Ct. at 941). In fact, as the United States Supreme Court has repeatedly made clear, doubts regarding

---

[4]      Whether plaintiff's claims against Sunrise are subject to arbitration has no bearing on this determination.   "[T]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered [requiring] rigorous enforcement of agreements to arbitrate even though [the result is] piecemeal litigation." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 51 n. 7 (1st Cir. 1986) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238, 1242-43 (1985)).

arbitrability should be resolved in favor of arbitration "unless it can be said with **positive assurance** that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *AT&T Technologies v. Communication Workers*, 475 U.S. 643, 650, 106 S. Ct. 1415, 1419 (1986) (emphasis added); *accord Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S. Ct. at 3354 ("as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability"); *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24, 103 S. Ct. at 941 ("questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration"); *Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 528 (1st Cir. 1985).

This mandate applies with even greater force where, as in this case, the arbitration clause is broad. *See Cleveland Wrecking Co. v. Iron Workers Local Union 40*, 947 F. Supp. 745, 748 (S.D.N.Y. 1996) (characterizing a clause which dictated submission to arbitration of "[a]ny claim or controversy arising out of or relating to th[e] agreement" as the "paradigm of a broad clause"), *aff'd*, 136 F.3d 884 (2nd Cir. 1997); *AT&T Technologies*, 475 U.S. at 650, 106 S. Ct. at 1419. "If the arbitration clause is broad, the Court 'must find that the parties bargained to have any dispute that arguably falls within the scope of that clause settled through arbitration absent compelling proof to the contrary.'" *Cleveland Wrecking Co.*, 947 F. Supp. at 748 (quoting *Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 886 (2nd Cir. 1982)); *accord United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585, 80 S. Ct. 1347, 1354 (1960) (only the "most forceful evidence" is sufficient to prevent a dispute from being submitted to arbitration).

Applying these standards, there can be no doubt that plaintiff's claims fall within the scope of the arbitration clause in the Franchise Agreement and, accordingly, that Coverall is

entitled to a stay of this action pending arbitration. The Franchise Agreement contains a broadly worded arbitration clause, requiring the submission to arbitration of "all controversies, disputes or claims between Coverall . . . and Franchisee [plaintiff] . . . arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall . . . ." Each of plaintiff's claims – which seek damages for Coverall's purported fraud, compensation for services allegedly provided pursuant to the Franchise Agreement, and rescission of that agreement – plainly arises out of and relates to the Franchise Agreement or the validity of that agreement. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406, 87 S. Ct. 1801, 1807 (1967) (language requiring arbitration of "[a]ny controversy or claim arising out of or relating to th[e] Agreement, or the breach thereof" was "easily broad enough to encompass" plaintiff's claim for fraudulent inducement and rescission). They are, as a result, arbitrable.

## III.    Coverall Is Entitled To A Stay Of This Action Under Section 3 Of The FAA

As demonstrated above, all of the issues raised in the plaintiff's Amended Complaint are referable to arbitration. Coverall is, as a result, entitled to a stay of this action pending arbitration. *See* 9 U.S.C. § 3; *Merit Ins. Co. v. Leatherby Ins. Co.*, 581 F.2d 137, 142 (7th Cir. 1978) (court must grant motion to stay when issue is referable to arbitration and party applying for stay is not in default); *Lippus v. Dahlgren Mfg. Co.*, 644 F. Supp. 1473, 1478 (E.D.N.Y. 1986).

### Coverall's Time To Respond To The Complaint Should Be Extended Until The Court Addresses Coverall's Motion To Stay Proceedings

If this Court grants Coverall's motion to stay proceedings pending arbitration, this matter will proceed in arbitration. Accordingly, the Court's ruling may obviate the need for Coverall to file an answer or, more likely, a motion to dismiss. For that reason, and to avoid the possible

waste of this Court's and the parties' resources, Coverall respectfully requests, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, that the Court extend Coverall's time to answer, move or otherwise plead in response to the Complaint until the Court has had an opportunity to address Coverall's motion to stay proceedings pending arbitration.

## <u>CONCLUSION</u>

For the foregoing reasons, Coverall's motion (i) pursuant to Section 3 of the Federal Arbitration Act, to stay this action pending arbitration, and (ii) pursuant to Rule 6 of the Federal Rules of Civil Procedure to extend Coverall's time to respond to plaintiff's Amended Complaint, should be granted.

> COVERALL NORTH AMERICA, INC.. d/b/a Coverall Cleaning Concepts and Coverall of Boston,
>
> By its attorneys,
>
> _____/s/ Michael D. Vhay_____
> Michael D. Vhay (BBO No. 566444)
> Traci S. Feit (BBO No. 660688)
> DLA PIPER RUDNICK GRAY CARY US LLP
> One International Place, 21st Floor
> Boston, MA  02110-2600
> (617) 406-6000 (telephone)
> (617) 406-6100 (fax)

Dated: September 30, 2005

# COVERALL CLEANING CONCEPTS®

# JANITORIAL FRANCHISE AGREEMENT

COVERALL CLEANING CONCEPTS ®
JANITORIAL FRANCHISE AGREEMENT
TABLE OF CONTENTS

| Paragraph | | Page No. |
|---|---|---|
| - | Information Regarding Franchisee and Franchise Package | 1 |
| 1 | Use of Trade Name, Service Marks, and Confidential and Proprietary Information | 2 |
| 2 | Term and Renewal | 3 |
| 3 | Territory | 3 |
| 4 | Initial Business and Guarantee | 3 |
| 5 | Additional Dollar Volume | 5 |
| 6 | Business and Management Services Provided By Coverall | 5 |
| 7 | Franchise and Other Fees | 7 |
| 8 | Refunds | 9 |
| 9 | Franchisee Business Operations | 10 |
| 10 | Franchisee Service to Customers | 11 |
| 11 | Keys and Security | 13 |
| 12 | Restriction on Use of Confidential Information | 13 |
| 13 | Franchisee is an Independent Contractor | 14 |
| 14 | Insurance | 14 |
| 15 | Indemnification | 16 |
| 16 | Assignment | 16 |
| 17 | Termination | 17 |
| 18 | Procedures After Termination | 18 |
| 19 | Non-Competition | 19 |
| 20 | Informal Dispute Resolution | 20 |
| 21 | Additional Remedies for Breach | 20 |
| 22 | Time to Assert Claims | 22 |
| 23 | Governing Law | 22 |
| 24 | Entire Agreement | 22 |
| 25 | Amendment | 22 |
| 26 | Waivers | 22 |
| 27 | Force Majeure | 22 |
| 28 | Severability | 22 |
| 29 | Notices | 22 |
| 30 | Successors Bound | 23 |
| 31 | Survival of Provisions | 23 |
| 32 | Captions | 23 |
| 33 | Guaranty | 23 |

FRANCHISE # F76

COVERALL NORTI

105 Central Stre

OVERALL OF BOSTON

m, Massachusetts 02180

rE: This is for new agreements
(not for transfers or renewals)

## JANITORIAL FRANCHISE AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Agreement") is entered into by and between Coverall North America, Inc., dba Coverall of BOSTON , a corporation organized and existing under the laws of the State of Delaware, hereinafter referred to as hereinafter referred to (singularly or collectively) "Coverall," and RHINA ALVARENSA . Franchisee is doing business as a "Franchisee" for the purposes of allowing Franchisee to operate a business as a Franchisee of Coverall. Franchisee is doing business as a:

☑ Sole Proprietorship ☐ Partnership ☐ Corporation, incorporated under the laws of

Effective Date of Agreement: The effective date of this Agreement will be the date it is signed by the Regional Director and Franchisee; provided, however, that if the Agreement is not signed by a corporate officer as provided on the last page of this Agreement, then the Agreement will not be effective.

Term of Franchise ("Initial Term"): 20 years
Franchise Package

Package Purchased: P---- 1500

Monthly $ Volume of Initial Business: $ 1500
Initial Business Offering Period: 120 days
(in which Initial Business shall be offered after Franchisee's completion of initial training - calculated per Paragraph 4A hereof)

Initial Franchise Fee: 10,500

Down Payment: 3800

Amount Financed by Coverall: 6700
(with interest at 12% per annum)

Financing Period: 24 months
(equal consecutive monthly installments of principal & interest)

Amount of Each Monthly Installment: 315.39

The first installment of principal and interest shall be paid on the last day of Sepr . 03.

**REPRESENTATIONS** Franchisee makes the following representations: If Franchisee is a sole proprietor, partnership, or corporation, there is set forth below, as the case may be, the name, address and other information of the sole proprietor, of each partner of the partnership, or of each shareholder in the corporation:
Franchisee Name: RHINA ALVARENSA
Address: 29 GRANT ST APT 0 SOMERVILLE 1MA 02145
Phone: 617-718-2865 Social Security Number: 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 Percentage Interest*:

Franchisee Name:
Address:
Phone: Social Security Number: Percentage Interest*:

Franchisee Name:
Address:
Phone: Social Security Number: Percentage Interest*:

*As to a partnership, this shall indicate the percent owned in the capital and/or profits of the partnership. As to a corporation, this shall indicate the percent owned of the outstanding stock of the corporation.

Federal I.D. # of Franchisee if a partnership or corporation:

Address for mailing notices to Franchisee:

Franchisee acknowledges receipt from Coverall of a Franchise Disclosure Document which describes the Franchise to be operated pursuant to the terms of this Agreement. Franchisee acknowledges receipt of a completed copy of this Agreement at least five (5) business days prior to its execution.

_____ 5/29/03
Franchisee's Signature Date

_____ _____
Franchisee's Signature Date

© 2003 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 1 of 24

## RECITALS:

A.    Coverall is the owner of certain trademarks and service marks, including the marks "Coverall®" and "Coverall Cleaning Concepts®;" and

B.    Coverall, as the result of the expenditure of time, skill, effort, and money, has developed and owns a distinctive system ("the System") relating to the establishment and operation of janitorial cleaning service businesses. The distinguishing characteristics of the System include, without limitation, methods, procedures, standards, and equipment for janitorial cleaning and business services; procedures for quality control and customer assistance; marketing concepts; bidding, contracting, and billing procedures; training, assistance, advertising, and promotional programs; all of which may be changed, improved, and further developed by Coverall from time to time; and

C.    Coverall, as part of its business operations, licenses the use of its name and service mark to Coverall franchised professional cleaning and maintenance businesses which provide cleaning, maintenance and janitorial services to commercial cleaning customers, and provides Coverall's franchisees with the various components of the System for use in their Coverall businesses; and

D.    Coverall, as part of its business operations, obtains customer accounts, which are contracts between Coverall and cleaning customers, under which Coverall delegates the performance of services to its franchisees; and

E.    Franchisee desires to utilize the trade name, service mark, reputation, techniques, and the System of Coverall, as a Coverall franchisee, in operating a commercial janitorial cleaning service business.

## TERMS OF AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained in this Agreement, the parties agree as follows:

1.    **USE OF TRADE NAME, SERVICE MARKS, AND CONFIDENTIAL AND PROPRIETARY INFORMATION.**

A.    The License.  Coverall grants to Franchisee a non-exclusive license, upon the terms and conditions contained in this Agreement, to use and display "Coverall®," "Coverall Cleaning Concepts®," "Coverall and Design®," "The Art And Science Of Cleaning®," "Making Your World A Cleaner Place®," "When It Has to be Absolutely Clean®," "Customers for Life®," and/or such other names and designs as Coverall may from time to time designate, as Franchisee's trademarks, service marks, trade names, logos, labels and designs (the "Marks"), but only in connection with the rendering of Franchisee's services in the commercial janitorial service business in the territory as described in Paragraph 3, and only on those items and in the form approved by Coverall. Nothing contained in this Agreement shall be construed to permit the use by Franchisee of the Marks in any medium, in any other manner or for any other purpose except as expressly provided.  Coverall expressly reserves all rights with respect to the Marks, as well as to any trade secrets, processes, methods of operation, and goodwill granted to Franchisee.  Accordingly, Coverall reserves the sole right to institute administrative proceedings and/or litigation regarding the Marks.  The Franchisee shall not have any right, title, or interest in or to the Marks, trade secrets, processes, methods of operation, or goodwill of Coverall.  Coverall further reserves the right to modify, discontinue and/or change the Marks, name, and/or design.  In the event of modifications, changes, or discontinuations, Franchisee will upon receipt of written notice, and at its sole expense, promptly discontinue use of the discontinued name and/or Marks and adopt and promptly begin use of the new or modified name and/or Marks, and promptly implement the modifications and/or changes to the System. Franchisee expressly and specifically waives any claims, demands, or damages arising from or related to the loss of the Marks (or any variation) and/or the loss of association with or identification with the Mark "Coverall®" arising out of Coverall's exercise of the above reservation.  Franchisee agrees to use only the Marks designated by Coverall and to use the Marks only in the manner approved by Coverall.  Franchisee agrees not to use the Marks or any name or design confusingly similar to the Marks in Franchisee's corporate or other legal or business name.  Franchisee must promptly tell Coverall if Franchisee learns about unauthorized use of Coverall's confidential, proprietary, and copyrighted information.

B.    Termination of License.  Upon the expiration or termination of this Agreement and the license for any reason, Franchisee agrees that it will, immediately discontinue the use of the Marks, deliver and surrender to



Initial  Initial

Coverall each and every Mark and every item bearing or containing the Marks. In addition, Franchisee shall not use any of Coverall's confidential information, trade secrets, processes, methods of operation or goodwill, and Franchisee shall not, directly or indirectly, continue to operate or do business under any name or in any manner, whether as an individual, agent, partner, shareholder, officer or director, that might tend to give the public the impression that Franchisee is operating a business operated, owned, licensed by, or affiliated with Coverall; and Franchisee shall cease to service in any manner the customer accounts which it serviced while it was a Franchisee.

C. **Coverall the Sole Owner.** Franchisee agrees that the Marks are the sole and exclusive property of Coverall. Franchisee will not assert any claim to the Marks, or the goodwill and reputation generated by the Marks. On account of the License accorded to Franchisee under this Agreement, Franchisee agrees that it will not do or permit to be done any act or thing in derogation of any of Coverall's rights, either during the Initial Term of this Agreement or after, and that Franchisee will use the Marks only as permitted in this Agreement.

2. **TERM AND RENEWAL.** This Agreement shall remain in full force and effect for a period of twenty (20) years from the date of execution (the "Initial Term") unless sooner terminated. Upon the expiration of the Initial Term of this Agreement, Franchisee shall have no further rights in the Franchise or the Agreement or the right to perform services under the contracts with the customer accounts unless Coverall and Franchisee execute a written renewal agreement ("Renewal Agreement"). Whenever in this Agreement the word "Term" is used, the word means the Initial Term, the Renewal Term, or both, as the context requires. Upon termination or expiration of the Term, for any reason, Coverall shall have no obligation to repurchase the franchise from Franchisee. The franchise shall be renewed if Franchisee:

A. Gives Coverall written notice of Franchisee's intent to renew not more than one hundred eighty (180) days nor less than ninety (90) days prior to the date of expiration of the Initial Term.

B. Executes, at least thirty (30) days prior to the date of expiration of this Agreement, the then current Coverall Janitorial Franchise Agreement ("Renewal Agreement"), and any other documents which Coverall deems necessary for Franchisee to execute upon renewal ("the Related Documents"). The Renewal Agreement and the Related Documents, shall be on the same terms and conditions, including the renewal term (the "Renewal Term") as Coverall is then granting to new franchisees, excepting that there shall be no payment of any additional franchise fee or renewal fee. The Renewal Agreement does not entitle the Franchisee to receive any volume of Initial Business.

C. Is not in default of, and has been in substantial compliance with this Agreement or any other agreement between Franchisee and Coverall on the date of giving notice, the date of execution of the Renewal Agreement, and the date of expiration of the Initial Term.

D. Executes a general release, in a form satisfactory to Coverall, releasing Coverall from any and all claims, known or unknown, arising from this Agreement.

E. Has not received from Coverall, at least six (6) months prior to the date of expiration of the Initial Term, written notice of an intent not to renew, which provides that Coverall is ceasing to do business in the area in which the Franchisee is located, or otherwise waives the non-competition provisions of Paragraph 19 upon expiration of the Term.

3. **TERRITORY.** Franchisee may conduct its business solely in the area(s) in which the Coverall office through which the Franchisee has purchased the Coverall franchise conducts business ("the Area"). Franchisee is granted no exclusive area within this territory and Coverall will sell numerous janitorial franchises in the Area.

4. **INITIAL BUSINESS AND GUARANTEE.**

A. **Initial Business.** Coverall will offer one or more customer accounts, located in the Area identified on Page 1, to fulfill Franchisee's Franchise Package. The Franchise Package shall consist of the gross dollar volume per month ("Initial Business") purchased by the Franchisee. The specific franchise package purchased by Franchisee is described on Page 1 under "Franchise Package."

(i) If Franchisee refuses to accept any customer account(s) timely offered to fulfill the Initial Business, Coverall shall be deemed to have fulfilled its obligations to offer customer accounts during the Initial Business Offering Period.

(ii) However, Coverall shall remain obligated to offer, within a reasonable period of time after the expiration of the Initial Business Offering Period (identified on Page 1), the amount of gross monthly dollar volume refused by Franchisee; provided, however, that if Franchisee unreasonably refuses to accept customer accounts offered within a reasonable time after the Initial Business Offering Period has expired, Coverall shall be deemed to have fulfilled its obligation to provide Initial Business for the dollar volume of the customer account(s) which has been unreasonably refused by Franchisee.

(iii) If Franchisee chooses to discontinue servicing a customer account(s) accepted as part of the Initial Business, Coverall shall be deemed to have fulfilled its obligation to provide Initial Business for the dollar volume of the abandoned customers account(s).

The time within which Coverall shall offer the Initial Business to Franchisee (the "Initial Business Offering Period," identified on Page 1), is calculated from the date of completion of Initial Training as follows:

(1)    For Initial Business packages up to and including $3,000 gross dollar volume per month (all packages up to and including the P-3,000), one hundred twenty (120) days;

(2)    For Initial Business packages exceeding $3,000 gross volume per month (all packages larger than the P-3000), one hundred twenty (120) days plus an additional thirty (30) days for each $1,000 (or portion thereof) in gross dollar volume per month over the initial $3,000.

Example:
Franchise Package:    $5,000
Initial Business Offering Period: 180 days from completion of training
Accordingly, if Franchisee purchases a P-5000 and completes Initial Training on March 1, all $5,000 in Initial Business must be offered on or before August 28 of that same year.

B.    Guarantee

Coverall provides a limited guarantee for the Franchisee's Initial Business. The guarantee applies only to customers lost through no fault of the Franchisee. Customers lost because of faulty workmanship, Franchisee's lack of trustworthiness or any other defaults by Franchisee are not guaranteed. Franchisee may qualify for either a twelve (12) month guarantee or a six (6) month guarantee, which begins on the date that Franchisee begins servicing the customer. If Franchisee qualifies for either guarantee, Coverall will replace the dollar volume of the lost customer, with one or more customers of equal dollar volume. If the replacement customer(s) has a dollar volume in excess of that lost by Franchisee, Franchisee may have to pay Coverall for the excess dollar volume.

This Initial Business guarantee is provided only under the following conditions:

(1) To qualify for the 12 month guarantee, for each month from the date Franchisee begins servicing an account, Franchisee must perform an inspection with the customer, and submit the Inspection Report, which must be signed by the customer, to Coverall no later than the 5th day following the inspection. *Franchisee must do all 12 inspections to qualify for the 12 month guarantee.*

(2) If Franchisee chooses not to perform the inspections, or if Franchisee fails to do an inspection in any month or fails to timely submit a properly completed Inspection Report, then Franchisee only qualifies for a 6 month guarantee.

(3) Dollar volume replaced by Coverall under either guarantee is only guaranteed to the extent that there is time remaining under the original guarantee. For example, if Franchisee loses an account after three months and Franchisee qualifies for the 6 month guarantee, the replacement account is only guaranteed for the time remaining, 3 months.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 4 of 24

Initial    Initial

C. The Initial Business Offering Period shall be extended upon the parties' mutual agreement or for the following periods of time in the following circumstances:

(1)   Retraining of Franchisee. If retraining of Franchisee is required pursuant to Paragraph 6A(2), the Initial Business Offering Period shall be suspended as provided in Paragraph 6A(2).

(2)   Franchisee's Material Breach of the Agreement. If Franchisee is in breach of any material provision of this Agreement or any other agreement between Franchisee and Coverall, the Initial Business Offering Period will be suspended until all material breaches are cured. Coverall's right to suspend the Initial Business Offering Period will not waive Coverall's rights to terminate Franchisee's franchise for the material breach.

D.   In the event Coverall fails to timely offer Initial Business in accordance with the provisions of this Paragraph 4, Franchisee's sole remedy shall be as provided in Paragraph 8C.

5.   ADDITIONAL DOLLAR VOLUME.

A.   Additional Dollar Volume Offered by Coverall. During the Term of this Agreement, Coverall may offer Franchisee an increase in dollar volume ("Additional Dollar Volume"). If Franchisee accepts additional dollar volume, Franchisee shall pay Coverall a sales and marketing fee pursuant to Paragraph 7B.

B.   Guarantee. The Additional Dollar Volume provided by Coverall shall be guaranteed for up to six (6) months. The guarantee applies only to customers lost through no fault of the Franchisee. Customers lost because of faulty workmanship, Franchisee's lack of trustworthiness or any other defaults by Franchisee are not guaranteed. To qualify for this guarantee, for each month from the date Franchisee begins servicing an account, Franchisee must perform an inspection with the customer, and submit the Inspection Report, which must be signed by the customer, to Coverall no later than the 5th day following the inspection. *Franchisee must do all 6 inspections to qualify for this guarantee.* Coverall will replace this Additional Dollar Volume within a reasonable time. Additional Dollar Volume replaced by Coverall under this guarantee is only guaranteed to the extent that there is time remaining under the original guarantee.

C.   Non-Refundable Sales and Marketing Fee. Except as provided in Paragraph 8C, the sales and marketing fee paid for Additional Dollar Volume is non-refundable. Should an account designated for Additional Dollar Volume cancel Franchisees' Services for any reason, Franchisee shall have no claim to a refund of the sales and marketing fee, and shall remain obligated to Coverall to pay the balance due under any financing arrangement.

D.   Additional Dollar Volume Obtained by Franchisee. Franchisee may increase its gross dollar volume of business by directly soliciting new customer accounts in accordance with Coverall's policies and procedures. Coverall will train Franchisee in its policies and procedures for soliciting business. Franchisee shall not pay Coverall any sales and marketing fees for additional customer accounts obtained solely by Franchisee. Any additional customer account obtained solely by Franchisee must sign a contract with Coverall in the form approved by Coverall, and these customer accounts shall be subject to the terms of this Agreement, except for Paragraphs 4, 5 and 8. Coverall does not guarantee customer accounts obtained by the Franchisee.

6.   BUSINESS AND MANAGEMENT SERVICES PROVIDED BY COVERALL. The services described in this Paragraph 6 are an integral part of Coverall's support system and are provided by Coverall in consideration for a management fee payable to Coverall in an amount equal to ten percent (10%) of the amount billed customers for any and all services and supplies provided by Franchisee, payable as described in Paragraph 7D. Coverall shall provide the following services:

A.   Initial and Additional Training

(1)   Initial Training. The training provided to Franchisee, among other things, deals with the operating of a franchise business using the Coverall system (the "Initial Training"). The Initial Training shall be provided to the person(s) signing this Agreement unless Coverall, in its sole discretion, agrees in writing to allow a


Initial   Initial

designee of Franchisee to attend the Initial Training instead of the person(s) signing this Agreement. Up to two employees of Franchisee, approved by Coverall, may also attend the Initial Training. There shall be no charge for the Initial Training.

(2) _Additional Training._ Any training to be provided to Franchisee by Coverall after the Initial Training, is "Additional Training." Additional Training shall include, but shall not be limited to, any training course offered in the Initial Training, or any other training provided by Coverall to Franchisee and/or its approved employee(s). Additional Training shall also include courses introducing new methods developed after the Initial Training. Franchisee's Additional Training may be offered through personal consultation and/or through group seminars. Personal consultations will be scheduled at the request of Franchisee and may be conducted by telephone or in person. The frequency and scheduling of group seminars will be determined at the sole discretion of Coverall. Additional Training shall be attended as provided in Paragraph 9A. The cost and method of payment for Additional Training shall be as provided in Paragraph 7F.

(3) _Retraining of Franchisee._ If (i) within a sixty (60) day period any two customers being serviced by the Franchisee complain to Coverall about Franchisee's faulty workmanship, lack of trustworthiness, or any other claimed default by Franchisee, or (ii) if at any time any customer being serviced by the Franchisee cancels Franchisee's services for faulty workmanship, lack of trustworthiness, or other default under that customer's account contract, or (iii) if, pursuant to Paragraph 10B of this Agreement, Coverall discontinues Franchisee's services to a customer, Coverall may, in any of these events, require retraining of Franchisee. In the event of retraining, the time within which to offer or provide any remaining Initial Business and/or Additional Dollar Volume will be suspended from the time Franchisee is requested to attend retraining until Franchisee completes retraining to Coverall's satisfaction. Retraining is Additional Training, and the Franchisee will be charged an Additional Training fee, in accordance with the provisions of Paragraph 7F.

B.   _Promotional and Sales Materials._ Coverall shall make available to Franchisee, at Franchisee's expense, promotional or sales materials for use in developing Franchisee's business.

C.   _Billing, Collection, and Records._ Coverall has the exclusive right to perform all billing for services and supplies provided by Franchisee. All customer payments made to Coverall and all credits due Franchisee shall be applied, in whole or in part, to Franchisee's then due or past due obligations under this Agreement and all other agreements, present and future, between Coverall and Franchisee. At the beginning of each month, Coverall shall invoice and collect payment from the customers for all services and supplies provided by Franchisee. On the last day of the month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month in which the services and supplies were provided by Franchisee, Coverall will pay Franchisee amounts collected from customers, _excluding_ amounts retained by Coverall on Strategic Accounts, _less_ amounts due Coverall for the fees described in Paragraphs 7 and 14, as well as note payments, transfer fees, equipment lease payments, advances, and any other amounts due Coverall or any third party lender through whom Franchisee has financed any purchase from Coverall.

If the services performed by Franchisee on any Coverall customer account(s) are discontinued for any reason, unless the customer account(s) is guaranteed as provided in Paragraphs 4 and 5 above, Coverall shall have the right to apply the entire amount of any payment subsequently received by Coverall from the customer account(s) no longer serviced by Franchisee to the balance (principle and/or interest) of any amount owed by Franchisee to Coverall, including but not limited to, promissory note(s), line of credit or any other financing provided to Franchisee by Coverall. Coverall shall also have the right but not the obligation, to pay any amount remaining after applying the payment to Franchisee's obligations to Coverall, to any third party lender from whom Franchisee borrowed funds to finance any purchase from Coverall. Nothing contained in this Paragraph 6C, however, shall be construed to release the Franchisee from its obligations to Coverall for any amount remaining due after applying the funds received from the discontinued customer account(s).

Coverall shall be entitled to recover from Franchisee all reasonable attorneys' fees, court costs, and expenses, and out-of-pocket costs which may be incurred by Coverall in enforcing payment by any customer accounts and/or payment by Franchisee and Franchisee's lenders, guarantors, or others. Coverall may, in its sole discretion, assign to Franchisee (in the form of a written assignment agreement) the right to enforce payment on any delinquent

© 2003 Coverall North America, Inc.

Initial   Initial

customer account(s) which Franchisee is servicing. This shall include the right of Franchisee to file a lawsuit against the delinquent customer. In the event of such an assignment, Franchisee shall pay any and all attorneys' fees, court costs and expenses necessary to collect and enforce payment. If, as a result of the assignment, Franchisee collects monies due on a delinquent customer account, Franchisee shall be responsible to Coverall for any unpaid royalties, management fees, note payments, and other payments (if any) due Coverall on amounts collected. Franchisee will keep Coverall timely advised as to any legal or other proceedings which Franchisee institutes, including, but not limited to, the outcome. Coverall shall also be entitled to grant a security interest in the receivables due from the customer accounts.

D. **Cash Flow Protection Services.** Coverall will advance to the Franchisee the amounts billed to customers serviced by Franchisee, whether or not those amounts have been collected, less amounts due Coverall. Advances will be made no earlier than the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month the services and supplies were provided. Advances attributable to billings for any one customer shall not exceed an amount equal to billings for sixty (60) days and shall not remain outstanding for a period exceeding ninety (90) days from the date on which the amount of the billing was due from the customer. If advances remain uncollected from the customer at the end of ninety (90) days, Franchisee shall repay Coverall the amount of the advance. Coverall will either charge back to the Franchisee the total amount advanced and uncollected or Franchisee will otherwise pay Coverall the amount of the advance.

E. **Assistance with Customer Relations.**

(1) Upon the request of the Franchisee, Coverall shall assist the Franchisee in developing a customer relations program for the benefit of the Franchisee's business.

(2) Coverall will use its best efforts to provide employees or contractors of Coverall to perform janitorial services in substitution of Franchisee or Franchisee's employees, for up to two consecutive services, in the event that a bona fide emergency (which, by way of example, would include Franchisee's sudden illness, involvement in an accident, or the death of Franchisee's close relative), prevents Franchisee or its employees from performing the services in a timely and efficient manner. Whether or not an event is a bona fide emergency shall be determined by Coverall in its sole discretion. In the event that Coverall or its subcontractors perform such substitute services, Franchisee shall receive no payment for such services rendered by Coverall or its subcontractors. Franchisee hereby waives any and all claims, demands, or rights to payments for any such services and further agrees that Franchisee shall not be entitled to any refund, rebate, or reduction of any fees previously paid or promised to Coverall in connection with such services.

7. **FRANCHISE AND OTHER FEES; COVERALL FINANCING.**

A. **Franchise Fee.** The "Initial Franchise Fee" is the amount set forth on Page 1, which is payable in cash, United States currency, upon the execution of this Agreement. A portion of the Initial Franchise Fee, $5,000, is the price that you pay for the license granted to you to use the Coverall® Marks, described in Paragraph 1A. This $5,000 portion of your Initial Franchise Fee is entirely non-refundable. Coverall may finance a portion of the Initial Franchise Fee. The amount financed by Coverall shall be payable in equal monthly installments of principal and interest at the rate of twelve percent (12%) per annum. Payment shall commence on the date set forth on Page 1, and shall continue thereafter on the last day of each consecutive month until paid in full. Franchisee shall execute a promissory note, payable to Coverall, in a form substantially similar to that attached as Exhibit B, reflecting the amount financed. Repayment of the amount financed by Coverall shall be made in accordance with the provisions of Paragraph 6C, through automatic withdrawal (debit) of the payment due from Franchisee's gross monthly billing. Coverall reserves the right to outsource the servicing of any financing that it provides to the Franchisee pursuant to Paragraphs 7A, 7B and 7G, to a third party vendor.

Alternatively, Coverall may choose to: (1) make financing available to the Franchisee through a third party lender upon terms and conditions determined by the third party lender; or (2) convert the promissory note to the line of credit described in Paragraph 7G. If financing is provided through a third party lender, Coverall may service the third party financing through automatic withdrawal (debit) of the payment due to the third party lender from Franchisee's gross monthly billings, and remit the payments directly to the third party lender.

B. **Sales and Marketing Fee.** A sales and marketing fee for additional dollar volume provided in accordance with Paragraph 5 shall be charged pursuant to this Paragraph 7B. The sales and marketing fee for each customer account or accounts shall be payable at the time an additional customer account or accounts are accepted by Franchisee. If the sales and marketing fees exceed $150.00, Coverall may agree to finance Franchisee's purchase(s) of additional dollar volume. The amount financed by Coverall shall be payable in equal monthly installments of principal and interest at the rate of twelve percent (12%) per annum over the period of time agreed upon by Franchisee and Coverall, which period shall not exceed twenty-four (24) months, unless financing is provided, at Coverall's discretion, through the line of credit described in Paragraph 7G or by a third party lender. Payment will commence on the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month that Franchisee begins servicing the account related to the amount financed, unless the purchase is financed through a line of credit, in which event, repayment shall be in accordance with the provisions of Paragraph 7G, or pursuant to the terms and conditions of any third party financing. Franchisee may be required to execute a promissory note, in a form substantially similar to that attached as Exhibit B, reflecting the amount financed.

The sales and marketing fee shall be calculated as set forth in the Coverall Policy and Procedure Manual, as it may from time to time be modified or revised by Coverall.

C. **Royalty.** A royalty in an amount equal to five percent (5%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day of the month in which the services were performed. The sum total of the royalty and management fees may, at the discretion of Coverall, be subject to minimum payments of $50 per month in the first year of operation and $100 per month thereafter. The minimum fee may be adjusted for increases in the Consumer Price Index.

D. **Management Fee.** A management fee, as described in Paragraph 6E, hereof, in an amount equal to ten percent (10%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day for the month in which the services were performed.

E. **Special Services Finder's Fee.** A fee shall be charged for special service contracts, for example, a one-time, non-recurring contract for services such as carpet cleaning, strip and waxing, or initial cleaning. The amount of the fee shall be twenty percent (20%) of the total special services contract price, unless Franchisee sells the job to the customer and furnishes all equipment, supplies and labor, in which case no fee will be charged. The total special services contract price equals the gross revenue from the contract to Franchisee before deduction of any other fee(s) payable to Coverall. Amounts billed customers for special services are subject to royalty and management fees.

F. **Additional Training Fee.** A fee shall be charged for Additional Training, as that term is defined in Paragraphs 6A (2) and (3). The Additional Training fee for each Additional Training course attended by Franchisee, and/or by Franchisee's employees, shall be Fifty ($50.00) Dollars. Coverall reserves the right to change the fee for any Additional Training course by setting forth the changed fee in the Coverall Policy and Procedure Manual as it may, from time to time, be amended. The Additional Training fee shall be due at the time of the Additional Training; however, Coverall may, in its sole discretion, upon the request of Franchisee, finance this Additional Training fee so that it is payable in up to twelve (12) equal monthly installments of principal and interest (which interest shall be at the rate of twelve (12%) percent per annum). If Coverall agrees to finance this Additional Training fee, Franchisee shall, prior to the Additional Training, sign a promissory note payable to Coverall, in the amount of the Additional Training fee. Notwithstanding the above, Additional Training fees totaling less than One Hundred Fifty ($150.00) Dollars in the aggregate will not be financed, and will be due at the time of the Additional Training.

G. **Alternative Financing.** Coverall reserves the right to extend, or make available to Franchisee alternative forms of financing, including the following:

1.) **Line of Credit.** The term "line of credit" shall mean a monetary amount which Coverall shall make available to Franchisee, and upon which Franchisee may draw, on a continuing basis, up to the maximum limit of the line of credit, for payment of a portion of Franchisee's Initial Franchise Fee, the purchase of Additional Dollar Volume (as defined in Paragraph 5A) and/or toward payment of any other item for which Coverall agrees to provide Franchisee financing. The initial limit of the line of credit shall be determined by Coverall, and Coverall may

thereafter, in its sole discretion, increase or decrease the amount of the line of credit. At such time as the line of credit is extended to Franchisee, Franchisee will be required to execute documents regarding the line of credit as are required by Coverall. Franchisee's obligations under the line of credit shall be as follows:

(a) When there is no promissory note(s) payable by Franchisee at the time the line of credit is extended:

(i.) The initial amount financed under the line of credit shall be repaid by the Franchisee in monthly installments of principal and interest over a 24 to 48 month period, as agreed on by Franchisee and Coverall. Repayment of the amount financed through the line of credit shall commence with the first Franchisee statement reflecting billings to accounts serviced by Franchisee. Repayment shall be made in accordance with Paragraph 6 C, through automatic withdrawal (debit) of the payment due from Franchisee's gross monthly billings. Nothing contained in this Paragraph 7 G (1)(a)(i) shall be construed to relieve the Franchisee of the obligation to repay any amount financed through the line of credit.

(ii.) Interest charged under the line of credit will be compounded daily, at the rate of twelve percent (12%) per annum; however, Coverall shall have the right to increase or decrease this rate of interest, upon first giving Franchisee 30 days prior written notice.

(iii.) Additional Dollar Volume purchased by Franchisee using the line of credit shall be repaid monthly in an amount equal to no less than twelve and one half (12 ½ %) of the Franchisee's gross monthly billings attributable to the Additional Dollar Volume purchased.

(iv.) If Franchisee is in default under the line of credit, Coverall shall have the right to declare the entire line of credit balance immediately due and payable. Events of default shall include failure by Franchisee to timely make any monthly payment; failure by Franchisee to timely perform any of the covenants, conditions, obligations or warranties in this Agreement or any other agreement between Franchisee and Coverall; the levy of any attachment, execution or other process against all or any part of the assets of Franchisee; the suspension or abandonment of the business of Franchisee; Franchisee's making of a general assignment for the benefit of creditors; and the commencement of proceedings by or on behalf of Franchisee or any guarantors of this Agreement for dissolution, liquidation, or bankruptcy.

(v.) Coverall shall have the right to assign its receivables, including Franchisee's obligations under its line of credit, to a third party lender.

(vi.) The terms and conditions of the line of credit may be modified or revised by Coverall, and these revisions shall be as published from time to time in the Coverall Policy and Procedure Manual, or in a written statement to Franchisee.

(b) When there is a promissory note(s) payable by Franchisee to Coverall at the time the line of credit is extended, the obligation evidenced by promissory note(s) may, upon 30 days written notice to Franchisee, be converted to the line of credit. In the event of conversion, the terms of payment by Franchisee shall remain the same as in the note(s) converted; however, if the amount of the line of credit is subsequently increased, the terms of the line of credit may thereafter be changed in accordance with the provisions of Paragraph 7G(1)(a).

2.) Third Party Financing. Coverall may make available financing to Franchisee through third party lenders upon terms and conditions to be determined by the third party lenders. Coverall may service third party financing and, if required, may remit the payment directly to the third party lender through automatic withdrawal (debit) of the payment due from Franchisee's gross monthly billings.

8. REFUNDS. Except as is otherwise provided in this Paragraph 8, Coverall shall have no obligation to refund any portion of any payment made under this Agreement.

© 2003 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 9 of 24

Initial    Initial

A. **Initial Business.** If Coverall does not (i) offer Franchisee, as provided in Paragraph 4A(i), all or any portion of the monthly dollar volume of Initial Business; or (ii) offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, as provided in Paragraph 4A(ii), a volume of Initial Business equal to that refused by Franchisee upon its initial, timely offer, provided Franchisee has not unreasonably rejected the post Initial Offering Period offer; or (iii) offer to replace guaranteed monthly dollar volume as provided in Paragraph 4B; then and in any event Franchisee will, upon Franchisee's request, be entitled to payment of an amount determined and payable as follows:

(1) **Determination of Amount Payable.** The monthly dollar volume of Initial Business (i) not timely offered by Coverall to Franchisee under Paragraph 4A(i); or, (ii) not unreasonably refused by Franchisee under Paragraph 4A(ii); or (iii) not replaced by Coverall under Paragraph 4B, as the case may be, shall (a) be multiplied by two and eight-tenths (2.8) - the resultant figure shall be referred to as "the Gross Recalculated Amount;" (b) The current replacement cost of Franchisee's starter kit shall be subtracted from the Gross Recalculated Amount - the resultant figure shall be the "Amount Payable to Franchisee."

(2) **Payment of Amount Payable to Franchisee.** If, at the time of the determination of the Amount Payable to the Franchisee, the Franchisee is indebted to Coverall, Franchisee's indebtedness shall be reduced by the Amount Payable to the Franchisee before the balance (if any) is paid to the Franchisee in cash or kind.

B. **Additional Dollar Volume.** If Coverall is unable to provide or replace all or any portion of Franchisee's Additional Dollar Volume within a reasonable period of time, Franchisee's sole remedy shall be a refund of whatever sales and marketing fee was actually paid by Franchisee. If, at the time of this refund, the Franchisee is indebted to Coverall, this refund shall be applied to Franchisee's indebtedness, before the balance (if any) is paid to the Franchisee in cash or in kind.

C. **Sole Remedy.** Franchisee acknowledges and agrees that the payment by Coverall to Franchisee of the Amount Payable to Franchisee, as provided in Paragraph 8A, shall be Franchisee's sole remedy in the event of Coverall's (i) failure to timely offer Initial Business; or (ii) failure to offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, a volume of Initial Business equal to that initially refused by Franchisee upon timely offer; or (iii) failure to replace guaranteed Initial Business. Franchisee further acknowledges and agrees that the refund to Franchisee, as provided in Paragraph 8B, shall be Franchisee's sole remedy in the event Coverall is unable to provide or replace any portion of Franchisee's Additional Dollar Volume. Franchisee agrees that this payment or refund is necessary as it would otherwise be difficult, if not impossible, to ascertain the damages incurred by Franchisee in the event of any failure by Coverall to timely offer or replace Initial Business, or to timely provide or replace Additional Dollar Volume. The parties agree that such payment or refund is not a penalty, but is a payment which Coverall must provide as liquidated damages as a consequence of Coverall's failure to offer or replace Initial Business, or to provide or replace Additional Dollar Volume. Upon Coverall's paying Franchisee, as provided in Paragraph 8A or 8B above as the case may be, Coverall shall be released from any obligation to offer or replace Initial Business, or to provide or replace Additional Dollar Volume, or to pay Franchisee any other damages.

9. **FRANCHISEE BUSINESS OPERATIONS.**

A. **Franchisee To Attend Training Course.** Franchisee shall attend the Initial Training as defined and described in Paragraph 6A(1), which is provided by Coverall to all new franchisees, and any other training courses Coverall may prescribe with respect to the needs of Franchisee or a particular customer serviced by Franchisee. The person signing this Agreement on behalf of Franchisee shall attend the Initial Training unless Coverall, in its sole discretion, agrees in writing to allow a designee of Franchisee to attend the Initial Training instead of the person signing this Agreement. Seminars shall be attended as provided in Paragraph 6A(1), although Franchisee's employees may also attend training. While there shall be no additional charge for the Initial Training, Franchisee shall be charged a fee for retaking Initial Training courses, including any retraining required under Paragraph 6A (3). The fee for the retaking of Initial Training courses and the manner of payment shall be as provided in Paragraph 7F.

B. **Franchisee to Abide by Policies and Procedures.** Franchisee understands and acknowledges that every detail of the System is essential to Coverall, Franchisee, and other System franchisees in order to (i) develop and maintain quality operating standards, (ii) increase the demand for the services sold by all franchisees operating

under the System, and (iii) protect Coverall's reputation and goodwill. Franchisee agrees to operate its business and provide service to customers in a manner consistent with the procedures, methods, and standards established in training programs, all manuals and directives, which shall include, but shall not be limited to, the Coverall Janitorial Franchisee Policy and Procedure Manual ("the Policy and Procedure Manual"), as it may be amended from time to time, and/or other policies or procedures which Coverall may issue from time to time. Franchisee shall refrain from operating in any manner which reflects adversely on Coverall's Marks or System. Franchisee may not implement any modification to the System without Coverall's prior written consent. Coverall shall have the right to incorporate any modification to the System developed by Franchisee without compensation to Franchisee.

Franchisee agrees to abide by, and to supervise Franchisee's employees to assure their compliance with, the terms of the Policy and Procedure Manual, as it may be amended from time to time, and that Franchisee will be bound by those changes.

C. **Quality Control Standards.** Franchisee, realizing that quality control and uniformity are important in the System, agrees to use in its business only uniforms, equipment, supplies, products, sales and promotional materials, control forms and other business forms as are prescribed or permitted by Coverall. Franchisee agrees that it and its employees will wear approved uniforms and identification badges while on the premises of a customer account. Franchisee is to maintain a safe place of business and comply with all OSHA requirements, as well as all federal, state and local laws and regulations, and all industry standards. Franchisee shall use its best efforts to procure qualified, competent, and conscientious employees and shall maintain a neat, clean, safe, and orderly operation in keeping with standards established by Coverall through its training and policies and procedures and agrees to devote sufficient time and effort to its business. Franchisee hereby permits Coverall to observe and evaluate from time to time the performance and quality of services by Franchisee.

D. **Modification to the System.** Franchisee understands and agrees that due to changes in competitive circumstances, presently unforeseen changes in the needs of the market, changing customer and consumer demands, presently unforeseen technological innovations, and for protection of the Marks, the System must be subject to modification in order that it best serves the interests of Coverall, Franchisee, and the System. Accordingly, Franchisee expressly understands and agrees that Coverall may from time to time alter, modify, or change the components of the System, including, but not limited to, modifying, altering, varying, and adopting new products, services, equipment, techniques, methods, programs, standards, training, sales training, forms, and policies and procedures; adding to, deleting from, or modifying those programs and services which Franchisee is authorized to offer; and changing, improving, or modifying the Marks.

Franchisee agrees, at Franchisee's own expense, to adopt on a timely basis (but in no case later than sixty (60) days after notice) any such modifications to the Coverall System set forth in updates or changes to the Policy and Procedure Manual, or in other written communications, as if they were a part of the Coverall System at the time of the execution of this Agreement. Coverall shall notify Franchisee in writing as to changes in the Policy and Procedure Manual or other changes in the operational structure of the Franchise.

E. **Coverall's Right to Audit.** Franchisee agrees to keep true and accurate business records and books of account which shall be open to inspection by Coverall or its duly authorized agent during regular business hours and Coverall shall have the right to examine same, including other related records. Upon Coverall's request, Franchisee shall prepare and/or produce to Coverall any other information, including without limitation financial statements and personal and business income tax returns, that will permit Coverall to verify that all fees due Coverall are fully, accurately, and truthfully accounted for and that Franchisee is not otherwise in breach of this Agreement.

F. **Customer List.** Upon Coverall's written request, Franchisee shall provide Coverall with a list of all cleaning customers for which Franchisee is and/or was providing cleaning services.

10. **FRANCHISEE SERVICE TO CUSTOMERS.** The parties agree that it is of the utmost importance that the services provided by Franchisee to the consuming public be consistent and adhere to those uniform standards of quality associated with the Coverall System and serve to enhance the reputation and goodwill associated with the

Coverall Marks. Franchisee thus acknowledges that the requirements of this Paragraph are necessary to assure continuing public acceptance and patronage of the Coverall System.

A. **Franchisee to Contact Customer Accounts.** Customer Accounts are delegated to the Franchisee to service. In order for Coverall and the Franchisee to keep the customer accounts, Franchisee must provide satisfactory service. Communication between the Franchisee and the customer account is important for understanding the needs of the customer account and knowing whether or not the service being performed by the Franchisee is satisfactory. Therefore, it is important for the Franchisee to develop a strong relationship with the contact person at the customer accounts. To facilitate customer account retention, Franchisee shall contact each customer account serviced by Franchisee, which has regular monthly service revenues of $500 or less. For each month commencing on the date that Franchisee begins servicing the customer account, Franchisee must contact the customer account either in person or by telephone and obtain a rating of Franchisee's performance. Franchisee must complete an Account Contact Report for each customer account contacted and submit them to Coverall no later than the 5th day of the month following the contact. Should Franchisee fail to submit the Account Contact Reports required by this Paragraph 10A for any two (2) consecutive months, Coverall may remove the Franchisee from the customer account for which the Account Contact Reports were not submitted. This obligation to inspect is continuing, and is unrelated to the inspections which Franchisee must perform in order to qualify for the customer account guarantee described in Paragraphs 4B and 5B.

B. **Franchisee to Furnish Staff, Equipment, Materials, and Supplies.** In consideration of the franchise fee paid by Franchisee, Coverall will provide, upon the opening of Franchisee's business, the equipment and supplies listed in Exhibit A of this Agreement. Thereafter, Franchisee will replace equipment and supplies as needed and will provide all staff, other equipment, materials, tools, and other supplies necessary to service customer accounts, including all janitorial services called for in each customer contract. In order to protect Coverall's Marks, all services will be performed in a good and workmanlike manner, satisfactorily to the customer account for which services are performed and in accordance with Coverall performance standards. Coverall may, at any time, inspect any premises serviced by Franchisee to assure that the quality of the services rendered is in accordance with Coverall standards. If Franchisee desires to cease servicing a customer account, Franchisee must give Coverall ten (10) days' written notice before ceasing service; in such event any remaining guarantee on the account shall be deemed to have been fulfilled, and Coverall shall have no obligation to replace the account.

C. **Protection of the Goodwill of the System.** Coverall, the Coverall System and Marks, and Coverall's Franchisees benefit from Coverall's goodwill, which arises out of Coverall's reputation in the market place. In order to protect Coverall and its Franchisees from the harm that arises from Franchisee activities that diminish Coverall's goodwill and Marks, Franchisee agrees that Coverall has the right to discontinue Franchisee's services to any customer upon the occurrence of any of the following:

(1) Franchisee fails to perform its obligations to the customer's satisfaction; or,

(2) The customer has made an oral or written complaint to Coverall; or,

(3) Coverall or the customer has given Franchisee written notice of Franchisee's failure to perform and five (5) days after delivery of the notice either the customer or Coverall is not satisfied that Franchisee has performed; or

(4) Franchisee receives three (3) written notices of failure to perform within a period of sixty (60) consecutive days, regardless of whether the Franchisee cured the deficiencies; or

(5) Coverall receives a request from a customer to terminate its contract; or,

(6) Coverall receives a request from a customer to replace the Franchisee; or

(7) Franchisee services any customer other than as a Franchisee of Coverall; or

(8) Franchisee fails to service a customer on any two (2) occasions within a period of sixty (60) days; or

(9) Franchisee ceases or refuses to service, or discontinues servicing, a customer for any reason without Coverall's consent; or

(10) Franchisee engages in conduct that reflects materially and adversely upon the operation and reputation of Coverall's and/or Franchisee's business(es) or the Marks or the System.

Upon the occurrence of any of the foregoing events, Franchisee agrees that all claims, demands, or rights to payments for any services performed after the date that Franchisee's services to a customer are discontinued are waived.

With the exception of termination by a customer without cause during the Guarantee Period, as provided in Paragraph 10 B (4), Franchisee further agrees that Franchisee shall not be entitled to a no-charge replacement of any customer nor to any refund, rebate, or reduction of any fees previously paid or promised to Coverall in connection with any customer lost pursuant to the provisions of this Paragraph 10.

11. KEYS AND SECURITY. Franchisee shall be responsible for all keys to a customer's premises and shall observe all security systems and precautions necessary or required at the customer's premises. If services to a customer are discontinued for any reason, or if this Agreement is terminated for any reason, Franchisee agrees to return all keys and security codes and cards before noon of the next service date, or sooner if the customer requires, to either Coverall or the customer as directed by Coverall. The parties agree that Coverall's damages for Franchisee's failure to comply with this provision are not susceptible to reasonably precise quantification and therefore agree that Franchisee will pay Coverall, as liquidated damages and not as a penalty, $500 per day for each day of non-compliance.

12. RESTRICTION ON USE OF CONFIDENTIAL INFORMATION.

Franchisee acknowledges that Coverall has for many years and at great expense acquired, researched, developed, and created plans, ideas, forms, procedures, methods of operation, knowledge, know-how and systems relating to the establishment and operation of a janitorial cleaning service business and that this information exceeds Franchisee's ordinary skills and experience and has been maintained confidential by Coverall.

In consideration for the receipt of Coverall's confidential information, Franchisee agrees that it shall not ever, except in the operation of Franchisee's Coverall business, and then only to those of Franchisee's employees who must have access to this information in order to operate the Franchise and/or service accounts, during the Initial Term of this Agreement and any Renewal Term, or at any time thereafter, divulge or use for the benefit of any other person(s), proprietorship, partnership, association, corporation, or entity, any confidential information, knowledge, or know-how concerning the systems of operation, programs, services, products, customers, or practices of Franchisee and/or of Coverall and/or pertaining to the System which may be communicated to Franchisee. Any and all information, knowledge, know-how, techniques and information which Coverall, its affiliate(s), subsidiary(ies) or designee(s), or the respective officers of each, designate as confidential shall be deemed confidential for the purposes of this Agreement.

Franchisee specifically understands and affirms that the following, without limitation, constitutes Coverall's confidential information: all proprietary equipment, products, services, technologies and procedures relating to janitorial and related services; all systems of operation, services, programs, products, procedures, policies, standards, techniques, specifications and criteria which now comprise or in the future may comprise a part of the System; software; Coverall's Manuals and Janitorial Franchisee Policy and Procedure Manual (as they may be adopted and/or amended from time to time); records pertaining to customers or billings; methods of advertising and promotion; customers; instructional materials; customer bidding, pricing, quoting, and billing methods; sales training; staff composition and organization systems; quality assurance programs; supervision systems; recommended services; record keeping systems and materials; bookkeeping systems and materials; business forms; product and service order forms; proposal and contract forms and formats; general operations materials; revenue reports; advertising, promotional, and public relations materials/campaigns/guidelines/ philosophy; specifications, systems, standards, techniques, philosophies and materials, guidelines, policies and procedures concerning the System; additions to, deletions from, and modifications and variations of the components constituting the System or the systems and methods of operations which are now, or may in the future, be employed by Coverall, including all standards and

specifications relating thereto and the means and manner of offering and selling same; and, all other components, specifications, standards, requirements and duties imposed by Coverall.

Franchisee shall not at any time copy, duplicate, record or otherwise reproduce any of the foregoing confidential information or material, in whole or in part, or otherwise make same available to any third party except as authorized herein. Upon the expiration or other termination of this Agreement, Franchisee shall return to Coverall all such confidential information including all materials, books, records, software and manuals deemed to be confidential which are in Franchisee's possession, custody, or control.

Franchisee and its employees who attend any or all of Coverall's initial training programs shall divulge only such confidential information as may be necessary, and then only to those full time and/or part time employees, agents, or independent contractors as must have access to it, in order to conduct the operation of the franchise business, and Franchisee shall take those precautions as shall be necessary to ensure that its employees retain the information in confidence.

If Franchisee is a proprietorship or partnership, Franchisee shall cause the proprietor or the partner, or other beneficial owner to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who subsequently assumes the status of proprietor, partner, or beneficial owner, within ten (10) days thereafter submit all executed Agreements to Coverall. If Franchisee is a corporation, Franchisee shall cause each officer, director, and shareholder to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who subsequently assumes the status of officer, director, or shareholder shall within ten (10) days thereafter submit all executed Agreements to Coverall. Franchisee, whether a sole proprietorship, partnership, or corporation, will cause each of its employees upon ten (10) days of the execution of this Agreement, or upon ten (10) days of hire of any employee, whichever last occurs, to execute a Coverall Confidentiality/Non-Competition Agreement.

13.    FRANCHISEE IS AN INDEPENDENT CONTRACTOR. Franchisee is and shall remain at all times a completely independent contractor in business for itself, and shall have no right or interest in or authority over Coverall or any of Coverall's property or business. Neither Franchisee, nor Franchisee's employees, are employees of Coverall. Neither Coverall nor Franchisee is the principal, agent, employer, employee, partner, officer, director, or owner of the other. Franchisee shall always hold itself out as an independent contractor in its dealings and communications with the public. Franchisee further agrees that it is not authorized to use the Marks or Substitute Marks in any capacity other than as provided in this Agreement, nor to sign on behalf of Coverall any checks, drafts, leases, bonds, mortgages, documents, bills, contracts, bills of sale or any other instruments in writing. Franchisee shall be free to conduct its business as it may deem best in providing services to the customer accounts, independently of the supervision, management, and control of Coverall, but Franchisee agrees to abide by all of the terms of this Agreement and all federal, state and local laws, OSHA requirements, and regulations of all government agencies having jurisdiction over the customer's premises or the activities conducted by Franchisee and all industry standards. Franchisee shall be responsible for all personal property, use, and other taxes assessed by governmental agencies. Franchisee shall be responsible for personal self-employment, income, and other taxes required to be withheld and hereby assumes full responsibility for payment of the employer's portion of any social security and other taxes required to be withheld for all of Franchisee's employees. Franchisee shall also pay and/or withhold taxes and premiums for unemployment and worker's compensation insurance for itself and all of its employees, as required by law. Franchisee shall provide Coverall, upon demand, proof of payment of all taxes due and compliance with all laws. Franchisee shall be responsible for all employment decisions and functions of its franchise business, including without limitation, those related to hiring, firing, training, wage and hour requirements, record keeping, supervision, and discipline of employees and order and sequence of work.

14.    INSURANCE. Franchisee shall be responsible for and shall indemnify and hold Coverall harmless for all losses, damages to property, or injuries to persons arising out of or connected with the performance or non-performance of Franchisee's business and services to customers, including any claimed damages for breach of security and claims or demands for damages resulting therefrom of whatever nature. Franchisee will obtain janitorial bonding in an amount not less than $100,000. Franchisee further agrees to maintain comprehensive liability insurance covering

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 14 of 24



Initial      Initial

property damage, loss and personal injury in amounts not less than $1,000,000 per occurrence; $2,000,000 in the aggregate; and a $5,000,000 umbrella policy; as well as comprehensive automobile liability, including personal injury and property damage insurance, in the minimum amount of $50,000, or the amount required by state law, whichever is higher; all such policies naming Coverall as an additional insured. Franchisee also agrees that its comprehensive liability insurance will not contain an exclusion for property in Franchisee's care, custody, and control. In addition to the above, if any account serviced by Franchisee requires higher insurance coverage or a type of insurance not specified herein, Franchisee will, at Franchisee's expense, obtain such insurance. Failure to do so will result in loss of that account.

If required by state law, Franchisee shall obtain workers' compensation insurance for itself and its employees for statutory limits. Regardless of the requirements of state law, however, if Franchisee has employees, Franchisee is required by Coverall to have workers' compensation insurance for these employees. If Franchisee is a sole proprietorship or a partnership having no employees and Franchisee is not required by state law to personally have worker's compensation insurance, Franchisee must obtain, in addition to the other insurance requirements described in this Paragraph 14, insurance that provides on-the-job accident and disability coverage for the Franchisee. The insurance that a Franchisee who is either a sole proprietor or a partner is required by Coverall to obtain must provide for the following minimum coverage: accidental death ($10,000.00), accidental dismemberment ($10,000.00), paralysis ($10,000.00), temporary total disability ($250.00 per week for 52 weeks), continuous disability ($250.00 per week for 52 weeks), and accident medical expense (maximum benefit of $25,000.00 for 52 weeks). Franchisee will also obtain employer's liability insurance in amounts no less than $100,000.00 each accident for itself and all of its employees, and shall comply with all state and federal laws to maintain a proper unemployment insurance account.

Coverall reserves the right from time to time to increase or decrease the minimum insurance limits. Changes shall be reflected in the Coverall Policy and Procedure Manual as it may be modified or revised and/or by providing Franchisee with written notice stating the changes.

Franchisee further agrees that all such insurance policies maintained by Franchisee shall be written by an insurance company (companies) in good standing and in compliance with all state and federal insurance laws and insurance regulatory agencies. Franchisee shall provide Coverall with thirty (30) days' written notice prior to the cancellation or termination of any insurance policy as defined herein. All insurance policies shall name Coverall as an additional insured.

Franchisee shall provide Coverall with proof of the above coverages and bond upon demand prior to the Franchisee commencing work on any customer account. If Franchisee fails to obtain any or all insurance as specified herein and approved by Coverall, Coverall may (but shall not be required to), in addition to other remedies, purchase such insurance for the benefit of Franchisee in which event Franchisee agrees to promptly reimburse Coverall for the cost. In the event it becomes necessary for Franchisee to reimburse Coverall for the costs of insurance, Franchisee authorizes Coverall to deduct the costs of the insurance, on a monthly basis, or as is otherwise necessary, from amounts to be paid by Coverall to Franchisee, as provided in Paragraph 6C. Types and amounts of insurance required to be procured by Franchisee may be modified, and the policy limits may be changed, from time to time by Coverall, in its sole discretion, by written notice to Franchisee through modification of policies and procedures, in the Coverall Janitorial Franchisee Policy and Procedure Manual, as it may be amended from time to time, or other reasonable manner.

Coverall may allow Franchisee to participate in a group insurance plan which provides the above required comprehensive liability insurance and bonding to Coverall and its participating franchisees through an insurance company that names Coverall and Franchisee as insured. The cost of this liability insurance and janitorial bonding provided through Coverall's Business Protection Program will include, in addition to the premium, a management fee and service charge as determined by Coverall, which shall be paid to Coverall. Coverall may also allow Franchisee to participate in an insurance plan which provides workers' compensation, franchise owner on-the-job accident insurance, and employer's liability coverage as provided above, for Franchisee and/or Franchisee's employees. The cost of this worker's compensation, franchise owner on-the-job accident insurance, and employer's liability coverage may include, in addition to the premium, a management and/or administrative charge as determined by Coverall which shall be paid to Coverall. If the cumulative premiums paid exceed the amounts required to fund the workers' compensation and franchise owner on-the-job accident insurance programs, the excess may be paid to and retained by Coverall. Premiums for the above plans may vary in different states and may change from year to year.

© 2003 Coverall North America, Inc.

Initial    Initial

The plans are subject to change, modification, and/or cancellation. Future changes in premiums, coverages, etc. will be set forth in the Policy and Procedure Manual.

15. **INDEMNIFICATION.** Franchisee shall be solely responsible for the services and results of services performed by Franchisee and its employees, and shall indemnify and hold harmless Coverall and its affiliates, and directors, officers and employees of each, and all other Coverall franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with Franchisee's operations. Franchisee further agrees that if Coverall is made a party to a lawsuit or other legal action in connection with the activities of Franchisee, then Coverall may tender the defense and/or prosecution of the case to the Franchisee who shall be responsible for diligently pursuing the case or action at Franchisee's expense, or Coverall may hire counsel directly to protect its interests and bill Franchisee for all costs and attorneys' fees incurred, and Franchisee shall promptly reimburse Coverall costs and expenses incurred. The obligations of Franchisee pursuant to this Paragraph shall survive the expiration or termination of this Agreement.

16. **ASSIGNMENT.**

A. <u>Coverall's Right to Assign the Franchise Agreement</u>. Coverall may, without the consent of the Franchisee, assign this Agreement, or Coverall's rights and duties under this Agreement, to any other entity or third party, whether affiliated with or independent of Coverall. Coverall may also assign to any other entity or third party, whether affiliated with or independent of Coverall, any promissory note or other negotiable instrument of Franchisee which is payable to Coverall, either in conjunction with or independent of this Agreement. Coverall's rights under this Agreement shall inure to the benefit of any assignee or legal successor to Coverall. Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Coverall may sell its assets, its Marks, or its System outright to a third party; may engage in a private placement or public offering; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments, and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages arising from or related to the loss of the Marks and/or the loss of association with or identification with the Mark "Coverall" arising out of Coverall's exercise of any rights granted Coverall by this Paragraph 16A.

B. <u>Franchisee's Right to Assign the Franchise Agreement</u>.

(1) An assignment is defined as a voluntary or involuntary, direct or indirect, assignment, transfer, sale, gift, or other disposition by the Franchisee or any of its owners of any interest in this Agreement, the ownership of the Franchisee entity, or the franchise business, which assignment includes, without limitation: (i) assignment of ownership of stock or partnership interest; (ii) merger or consolidation or issuance of securities representing an ownership interest in the Franchisee entity; (iii) assignment in a divorce, insolvency, partnership, or corporate dissolution proceeding or otherwise by operation of law; and (iv) assignment in the event of death of the Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws of intestate succession.

(2) Franchisee may, with the written consent of Coverall obtained after thirty (30) days prior written notice to Coverall, which consent will not be unreasonably withheld, assign this Agreement to a person ("the assignee") meeting the qualifications then established by Coverall for granting new franchises, provided: (i) Franchisee provides Coverall a copy of any written agreements relating to the proposed assignment or transfer, and any additional information which Coverall may require in order to determine whether it will grant its consent to the proposed assignment or transfer; (ii) the assignee enters into the franchise agreement then used by Coverall for granting new franchises; (iii) Coverall shall assess Franchisee a transfer fee of $1,500; (iv) Franchisee pays to Coverall all amounts due by Franchisee to Coverall; (v) Franchisee executes confidentiality and non-competition agreements in assignee's favor and in Coverall's favor with terms and conditions the same as the non-competition covenant in Paragraphs 12 and 19 of this Agreement; (vi) the assignee shall have the ability to immediately be in compliance with all laws, regulations and ordinances governing commercial janitorial cleaning; and (vii) Franchisee executes a general release, in a form satisfactory to Coverall, of any and all claims against Coverall and its affiliates and their officers, directors, employees, and agents; and (viii) the shareholders or partners of any corporate or partnership assignee


Initial   Initial

comply with the guaranty provisions of Paragraph 33 of this Agreement.

(3)  Coverall may, in Coverall's sole discretion, withhold written consent of any proposed assignment in the event that Franchisee is in default under the terms of this or any other agreement with Coverall until default is cured.

(4)  If, at the time of an assignment by Franchisee, there is Initial Business or Additional Dollar Volume to which Franchisee ("the assignor") is entitled, which Coverall has not yet provided, this Initial or Additional Dollar Volume shall be provided by Coverall to the assignee within a reasonable amount of time after the assignee successfully completes the Initial Training, as is provided in Paragraphs 6 and 9.

(5)  If at the time of an assignment of this Agreement, Franchisee is performing cleaning services ("services") on any accounts which will be transferred to assignee, the assignee shall, within forty-five (45) days from the date of the assignment, complete, to Coverall's satisfaction, the Initial Training, as provided in Paragraphs 6 and 9. Until assignee completes the initial training to Coverall's satisfaction, the assignor shall supervise the cleaning of the assignee's cleaning accounts. If the assignee does not complete training to Coverall's satisfaction within forty-five (45) days or assignor does not provide the required supervision, Coverall may at the end of this forty-five (45) day period terminate the right of the assignee to continue to perform services on these assigned cleaning accounts, in which event Coverall will have no obligation to replace the dollar volume of business represented by such terminated cleaning accounts. However, assignee's rights to provide services to these cleaning accounts may be terminated prior to the expiration of forty-five (45) days if the assignee fails to satisfy the requirements of Paragraph 10, or otherwise breaches the terms of the Franchise Agreement.

C.  Franchisee's Right to Assign Cleaning Contracts. Franchisee must obtain Coverall's written consent before assigning the right to perform services under any individual customer accounts, which consent will not be unreasonably withheld. A ten percent (10%) transfer fee, not to exceed $500 per account, may be assessed.

17.  TERMINATION. This Agreement may be terminated at the option of Coverall in the event of a default by the Franchisee. In no event shall such termination relieve Franchisee of any of its obligations already incurred by or under this Agreement. A default is any of the following:

A.  Franchisee's material breach of this Agreement or any other agreement between Coverall and Franchisee. Material breach includes, without limitation, violations of Paragraphs 1, 7, 9, 11, 12, 13, 14, and 15.

B.  (1)  One or more discontinuance, for cause, by a customer or by Coverall, of Franchisee's services to a customer account; or

(2)  Franchisee's violation of Paragraph 10B(1), (2), and (3) (Franchisee's failure to perform its obligations to the customer's satisfaction pursuant to the spirit and intent of this Agreement or the janitorial cleaning services contract; or if the customer has lodged an oral or written complaint with Coverall, or Coverall has given Franchisee written notice of its failure to perform delivered by mail or in person, and (i) the customer or Coverall is not satisfied within five days from the date of delivery of such notice, or (ii) the customer or Coverall is dissatisfied on three occasions within a period of sixty (60) consecutive days); or

(3)  Franchisee's violation of Paragraph 10B(7) (Franchisee servicing any customer in a capacity other than a bona fide Coverall Franchisee); or

(4)  Franchisee's violation of Paragraph 10B(8) (Franchisee failing to service a customer on any two occasions within a period of sixty (60) days); or

(5)  Franchisee's violation of Paragraph 10B(9) (Franchisee ceasing or refusing to service, or Franchisee's discontinuance of servicing a customer for any reason without Coverall's consent); or

(6)  Franchisee's violation of Paragraph 10B(10), or engaging in any other conduct that reflects materially and adversely upon the operation and reputation of Coverall's or Franchisee's business(es) or the Coverall Marks or the System.

C.  Franchisee's insolvency or adjudication as bankrupt or the Franchisee's business coming into

possession or control, even temporarily, of any trustee in bankruptcy or appointed receiver or the making of a general assignment for the benefit of creditors.

D.  Franchisee's attempt to assign this Agreement or the franchise business, or any right or obligation hereunder, without first securing Coverall's written consent, upon thirty (30) days' written notice to Coverall.

E.  Franchisee's voluntarily abandoning the franchise business.

F.  Franchisee's having been charged with a work-related crime or any other crime that substantially impairs the goodwill associated with the Marks and System.

G.  Franchisee's failure on two or more occasions to comply with one or more of the provisions of this Agreement or any other agreement between Coverall and Franchisee.

H.  Franchisee's breach of Paragraph 19 of this Agreement.

I.  Franchisee's engaging in conduct that reflects materially and adversely upon the operation and reputation of Coverall's or Franchisee's businesses or the Marks or the System.

J.  Franchisee's monthly revenues are below $150 for two consecutive months or for each of any three months in a six-month period.

K.  A material misrepresentation in Franchisee's application to become a franchisee.

L.  At any time more than: (i) nine (9) months after the death or incapacity of Franchisee, or the appointment of a conservator or guardian for the person or estate of Franchisee, if Franchisee is an individual; or (ii) nine (9) months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if Franchisee is a partnership; provided, however, that this Agreement shall not terminate if within nine (9) months this Agreement or the general partner's interest is assigned in accordance with the provisions of Paragraph 16.

If the termination results from default as defined in subparagraphs A, D, H, or L of this Paragraph 17, termination may occur upon the expiration of ten (10) days following written notice of default, or as otherwise provided by law, if by then the Franchisee has failed to cure the default. If termination results from default as defined in subparagraphs B, C, E, F, G, I, J, or K, of this Paragraph 17, termination may occur immediately, without notice or opportunity to cure, unless otherwise provided by law.

18.  <u>PROCEDURES AFTER TERMINATION</u>.  Upon expiration, termination, or assignment of this Agreement for any reason, Franchisee shall cease to be a Coverall Franchisee and shall do all of the following acts and things, each of which shall survive the termination of this Agreement and shall remain an ongoing obligation of Franchisee:

A.  Immediately pay to Coverall all monies due to the date of termination, and cease doing business in accordance with the provisions of Paragraph 19. Any amounts due Coverall at or after Franchisee's termination may be offset against any amounts collected by Coverall on Franchisee's behalf.

B.  Immediately and permanently discontinue the use of all Coverall Marks, or any other name or designation indicating or tending to indicate that Franchisee is or ever was an authorized Coverall franchisee. Furthermore, Franchisee shall not promote or advertise the fact that Franchisee was formerly a franchisee or affiliate of the Coverall organization.

C.  Promptly surrender to Coverall all stationery, letterheads, forms, manuals, printed matter, films, books, cassettes, videotapes, and advertising containing Coverall Marks, including, but not limited to, the proprietary mark "Coverall," or any similar names or marks or designation indicating or tending to indicate that

Franchisee is or was an authorized Coverall franchisee and promptly return to Coverall any equipment leased to Franchisee.

D.      Immediately and permanently discontinue all advertising as a Coverall franchisee.

E.      Immediately and forever cease and desist from using the Coverall System, including, but not limited to: Operating, Training, Sales, and Technical Manuals and aids, videotapes, cassettes, books, advertising and promotional materials, and all trade secret and confidential and proprietary material delivered to Franchisee pursuant to this Agreement.

F.      Return the Coverall Janitorial Franchisee Policy and Procedure Manual; Operating, Training, Sales, and Technical Manuals, and any other Manual, and videotapes which contain Coverall Marks or which are part of the Coverall System.

G.      Return the unused portion of the initial equipment and supply package received from Coverall, as well as any and all cleaning equipment and/or supplies which Franchisee is leasing from Coverall.

H.      Refrain from doing anything which would indicate that Franchisee is or ever was an authorized Coverall franchisee.

I.      Maintain all books, records, and reports required by Coverall pursuant to Paragraph 9 for a period of not less than three (3) years after the termination of this Agreement and allow Coverall to make final inspection and audit of Franchisee's books and records during normal business hours within the three (3) year period for the purpose of verifying that all required fees have been paid.

J.      Immediately and permanently discontinue wearing any apparel indicating or tending to indicate that the Franchise is or was an authorized Coverall Franchise, and promptly surrender to Coverall all career apparel bearing a Coverall Mark.

K.      Franchisee acknowledges and agrees that during the term of this Agreement, as well as after termination, expiration, or transfer, Franchisee's name, home address, and home telephone number will be disclosed in Coverall's franchise offering circular.

L.      All obligations of the parties which survive the expiration or termination of this Agreement shall continue in full force and effect.

19.     NON-COMPETITION. In consideration of the management services, expertise, and services provided by Coverall, and the receipt by Franchisee of confidential information, and to protect the integrity of Coverall's Marks and System, Franchisee agrees to the following:

A.      In-Term Covenant Not to Compete. Franchisee agrees during the Term of this Agreement and any Renewal Term that Franchisee will not to engage in, or have any financial interest in (either as an individual, principal, owner, agent, employee, partner, stockholder, or director) any business (other than the franchise granted by this Agreement) which performs janitorial and related cleaning and management services, franchising, sales or contracting, or any related business anywhere. In addition, Franchisee will not interfere with Coverall customer accounts, by attempting to persuade the cleaning accounts to do business with anyone other than Coverall; by way of example, influencing the customer accounts to pay Franchisee or some affiliated person or entity directly.

B.      Post-Termination Covenant Not To Compete. In the event this Agreement is assigned, terminated, or expires, for any reason whatsoever, Franchisee agrees not to compete, directly or indirectly, for a period of eighteen (18) months from the date of assignment, termination, or expiration with Coverall or any of Coverall's affiliates or franchisees by engaging in or having any financial interest in (either as an individual, principal, owner, agent, employee, partner, stockholder, director, or in any other capacity) any business that performs building cleaning and maintenance services, in any county located partially or entirely within, or contiguous to, the Metropolitan

Statistical Areas in which Franchisee's Coverall Regional office conducts business, or within a 100-mile radius of that Coverall Regional office, whichever distance is greater. Franchisee will not, during the time period and in the geographic area covered by this Paragraph 19B, interfere or attempt to interfere with previously existing Coverall cleaning customers by diverting or attempting to divert from Coverall any cleaning accounts which were being serviced by Coverall franchisees or subcontractors during the year preceding the date on which Franchisee left the Coverall system.

     C.    Persons Bound By Covenants Not To Compete.  Any person or entity having any legal or beneficial relationship to or interest in or traceable to, down, or through Franchisee is bound by the provisions of these covenants.  Such persons shall include, but shall not be limited to, Franchisee's family members.

     D.    Court Modification of Agreement.  The Franchisee agrees that this form of Agreement is prepared for use in many jurisdictions with differing public policies and that such public policies change. Accordingly, the Franchisee agrees that the prevailing non-competition restrictions set forth above may be modified by a Court to the extent necessary to make the non-competition agreements valid and enforceable against Franchisee.

     E.    Enforcement of Covenants Not to Compete.  The covenants not to compete may be enforced by Coverall, its successors and assigns.

    20.    INFORMAL DISPUTE RESOLUTION.

     A.    Mediation.  Except as is otherwise provided in Paragraph 20B, if a dispute arises out of or relates to this Agreement, or to the relationship of the parties, and if the dispute cannot be resolved or settled through negotiation, the parties agree that prior to the filing of any arbitration or other legal action consistent with the provisions of this Agreement, they will attempt, in good faith, to settle the dispute by non-binding mediation administered pursuant to the Commercial Mediation Rules of the American Arbitration Association, or as otherwise agreed upon by the parties.  The mediation shall take place in the Area in which Franchisee conducts its business (as defined in Paragraph 3), and shall be administered by a neutral mediator agreed upon by the parties.  In the event the parties are unable to agree upon a mediator within 15 days of the date on which either party requests mediation of a matter, the mediator shall be provided by the American Arbitration Association.  The costs of the mediation shall be shared equally by the parties.

     B.    Notwithstanding anything to the contrary in Paragraph 20A, if Franchisee's Coverall Franchise Agreement has expired or been terminated, or if Franchisee has abandoned or failed to operate the Franchise for more than 30 days, Coverall shall not be required to avail itself of non-binding mediation in matters dealing with (i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promissory notes, equipment purchases, or lines of credit.

    21.    ADDITIONAL REMEDIES FOR BREACH.

     A.    Arbitration.  Except as otherwise provided in Paragraphs 21A(14) and 21B, all controversies, disputes or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual, which controversies, disputes or claims are not resolved in accordance with Paragraph 20, shall be submitted promptly for arbitration.

     (1)    Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

Initial     Initial

(2) The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.

(3) The costs of the arbitration shall, subject to the provisions of Paragraph 21C of this Agreement, be shared equally by Franchisee and Coverall; further provided, if there is more than one arbitrator, each party shall, subject to the provisions of Paragraph 21C, be responsible for the fees of the arbitrator appointed by that party.

(4) In matters involving an initial claim of Fifty Thousand Dollars ($50,000.00) or less there shall be one arbitrator.

(5) In matters involving an initial claim of more than Fifty Thousand Dollars ($50,000.00), the arbitration proceeding shall, unless otherwise agreed, be conducted before a panel of three (3) arbitrators.

 (i) Coverall and Franchisee shall each appoint one arbitrator, and the two appointed arbitrators shall appoint a third arbitrator to serve as Chair of the arbitration panel.

 (ii) If a party fails to appoint an arbitrator within thirty (30) days from the date of the demand for arbitration, the appointment shall be made by the American Arbitration Association, or such other entity as the parties mutually select.

(6) The arbitrator or appointed arbitrators shall not alter or otherwise reform the terms of this Agreement, or award any relief or grant any remedy not provided for in this Agreement or specifically excluded by this Agreement.

(7) The arbitrator or appointed arbitrators shall have the right to grant monetary relief only. However, there shall be no award of exemplary or punitive damages.

(8) The decision of the arbitrator or arbitrators shall be conclusive and binding upon all parties, and judgment upon the award may be entered in any court of competent jurisdiction.

(9) The parties agree to be bound by the provisions of any applicable limitation on the period of time in which claims must be brought, including any set forth in this Agreement.

(10) The parties agree that in connection with any arbitration proceeding, each party shall file any related counterclaim within thirty (30) days of the date of the filing of the claim to which it relates or be forever barred.

(11) Franchisee and Coverall agree that arbitration shall be conducted on an individual, not a class wide basis.

(12) The parties agree that discovery may be conducted in accordance with the provisions of the Federal Rules of Civil Procedure.

(13) A decision by the arbitrator or arbitrators (including any finding of fact and/or conclusion of law) against either Coverall or Franchisee shall be confidential unless otherwise required to be disclosed by law or by any administrative body and may not be collaterally used against either of them in existing or subsequent litigation or arbitration involving any other franchisee or third party.

(14) Notwithstanding anything to the contrary in this Paragraph 21A, if Franchisee's Franchise has expired or been terminated, or if Franchisee has abandoned or failed to operate the Franchise for more than 30 days, Coverall shall not be required to avail itself of arbitration in matters dealing with



(i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promissory notes, equipment purchases, or lines of credit.

    B.    <u>Injunction and Specific Performance.</u>    Notwithstanding anything in Paragraphs 20 and 21 to the contrary, Coverall shall be entitled to apply directly to a court of competent jurisdiction for the entry of preliminary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement or any other related agreement pertaining to Franchisee's use of the Marks; the obligations of Franchisee regarding confidentially or non-competition; any assignments or attempted assignments of this Agreement by Franchisee; any matter relating to the ownership of the Franchise, and/or any other matter for which Coverall would have no adequate remedy at law. If Coverall secures any injunction or order of specific performance, Franchisee agrees to pay Coverall an amount equal to the costs incurred by Coverall in obtaining relief, including, without limitation, attorney's fees, litigation costs and expenses, as well as any damages incurred by Coverall as a result of Franchisee's actions.

    C.    <u>Attorneys' Fees.</u>  Should either Party incur attorney's fees in order to enforce the terms and conditions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees.

    D.    <u>Survival.</u>  The parties agree that the provisions of this Paragraph 21 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

    22.    <u>TIME TO ASSERT CLAIMS.</u>  Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Coverall, or Franchisee's operation of its business, brought by any Party hereto against the other, shall be commenced within two years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

    23.    <u>GOVERNING LAW.</u>  This Agreement shall be interpreted and governed by the laws of the state in which the Franchise granted herein is located.

    24.    <u>ENTIRE AGREEMENT.</u>  This is the full agreement of the parties. Any matter which is not actually written down and included in this document is not a term of this Agreement. To avoid any later misunderstanding about the exact terms of the Agreement, each Party affirms, by signing this Agreement, that it has not relied on any comment, promise, or representation not actually included in this Agreement. By signing this Agreement, the parties mutually agree that no evidence shall be admitted in any proceeding as to the existence of any term or promise claimed to be a part of the Agreement unless that term is explicitly stated within the Agreement. *DO NOT SIGN THIS AGREEMENT IF YOU ARE RELYING UPON ANY REPRESENTATION OR PROMISE NOT STATED IN THIS AGREEMENT.*

    25.    <u>AMENDMENT.</u>  This Agreement may not be modified, altered, or amended except in writing executed by all of the Parties.

    26.    <u>WAIVERS.</u>  Waiver by Coverall of any one or more defaults shall not operate as a waiver of successive or other defaults and all of Coverall's rights shall continue notwithstanding any such waiver or waivers.

    27.    <u>FORCE MAJEURE.</u>  No party shall be liable for any loss or damage due to any delay in the performance of the terms (except for the payment of money) by reason of strikes, lockouts, and other labor troubles, fires, riots, wars, acts of terrorism, embargoes and civil commotion, or acts of God. Any such delay shall extend performance only so long as such event is in progress.

    28.    <u>SEVERABILITY.</u>  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

    29.    <u>NOTICES.</u>  Any notices to be given by either Party to the other may be effected in writing either by

Initial    Initial

personal delivery or by first class mail, postage prepaid. Mailed notices should be addressed to Franchisee and to Coverall at the addresses set forth on Page 1 of this Agreement. Either Party may designate a different address for notice in writing delivered to the other Party. Notices personally delivered shall be deemed received when delivered. Notices sent by mail shall be deemed received on the second day following mailing.

30. <u>SUCCESSORS BOUND</u>. This Agreement shall bind, and shall inure to the benefit of, the executor, administrator, personal representative, heirs, successors and assigns of each of the Parties.

31. <u>SURVIVAL OF PROVISIONS</u>. Any provision or covenant of this Agreement which expressly or by its nature imposes obligations beyond the expiration or termination of this Agreement shall survive expiration or termination.

32. <u>CAPTIONS</u>. The captions used in this Agreement are inserted as a matter of convenience. The text of any paragraph of this Agreement shall control its interpretation.

33. <u>GUARANTY</u>. The partners of any partnership and the shareholders of any corporate entity constituting the Franchise, and the partners of any partnership or shareholders of any corporate entity that may own the shares of the partnership or corporate entity which is the Franchisee, (the names of such partners or shareholders are listed in on page 1), do by signing this Agreement, (i) guaranty the performance of all Franchisee's responsibilities and duties; (ii) guaranty the payment of all sums which may from time to time become due to Coverall under this Agreement; and (iii) agree to be bound by Paragraphs 1B, 12, 19, and 21. The partners or shareholders and their spouses shall also, at the time of the execution of this Agreement, execute the current form Guaranty to the Coverall Janitorial Franchise Agreement. The partners or shareholders also agree to execute all Promissory Notes executed by Franchisee.

This provision shall be equally binding upon the current shareholders of the corporate entity which is the Franchisee, and upon any additional shareholders who may subsequently obtain an ownership interest in the Franchisee. If Franchisee is a corporation, Franchisee specifically agrees that within thirty (30) days prior to any additional shareholder or shareholders obtaining an ownership interest in Franchisee, that Franchisee shall notify Coverall in writing of this fact. At that time, Coverall will give Franchisee its then current Franchisee shareholder guaranty form. The form is to be executed by the additional shareholder or shareholders concurrently with their obtaining their ownership interest in Franchisee.

SIGNATURES APPEAR ON THE FOLLOWING PAGE.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year written above (see Page 1 of this Agreement).

(If Franchisee is a partnership, this Agreement must be signed by each partner. If Franchisee is a corporation, this Agreement must be signed by a duly authorized officer.)

THIS AGREEMENT SHALL NOT BE VALID UNLESS SIGNED BY (i) FRANCHISEE; (ii) AN AUTHORIZED REPRESENTATIVE OF COVERALL'S REGIONAL OFFICE; AND (iii) A CORPORATE OFFICER AT COVERALL'S CORPORATE OFFICE.

FRANCHISEE: _Rhina Alvarenga_
             (Print name of sole proprietor, partnership, or corporation.)

By: _Rhina Alvarenga_                    _5/29/03_
                                          Date Signed

By: _____            _____
                                          Date Signed

By: _____            _____
                                          Date Signed

COVERALL NORTH AMERICA, INC.

By: _____            _5/29/03_
                                          Date Signed

Title: _Regional Director_

COVERALL OF BOSTON

ACCEPTED ON THIS _5th_ DAY OF _June_ _2003_
(EFFECTIVE DATE OF AGREEMENT)

COVERALL NORTH AMERICA, INC.

By: _____ , Vice President